UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARSETTA REED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 10 C 0001 |
| | ) |
| v. | ) Magistrate Judge Arlander Keys |
| | ) |
| MICHAEL ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

A.  Factual Background & Procedural History

On January 27, 2004, Ms. Reed filed an application for
Supplemental Security Income, alleging that she became disabled
and unable to work as of September 7, 2002.  The Social Security
Administration denied her application initially and on appeal,
and she requested a hearing before an Administrative Law Judge.
Administrative Law Judge Alfred Burton initially convened the
hearing on December 7, 2007.  But because Ms. Reed was not
represented at that time, and because she expressed a desire for
representation, ALJ Burton continued the hearing to allow Ms.
Reed to consult with an attorney.  The case was reassigned to ALJ
Mike Logan, who re-convened on March 31, 2008.

1.  Testimony at the Hearing Before the ALJ

Ms. Reed, then 45 years old, appeared and was represented by
counsel.  She testified that she is 5'2" tall and weighs 203 lbs.

Record at 699. She testified that, in the three years prior to the hearing, she had experienced a weight gain of about 30 lbs. Record at 700. She testified that she is single and lives with her 13-year-old son, who is in 8th grade, and her 19-year-old daughter, who is in college at Loyola. Record at 700, 715. She testified that she graduated from Southern Illinois University in 1986, and that, in 2004, she started taking classes in interactive media design, but dropped out because she had difficulty keeping up with the workload. Record at 701-702. She testified that she has a driver's license, but no car and no access to a car. Record at 700-701.

Ms. Reed testified that she worked for the United States Postal Service as a machine distribution clerk from January 1989 until she was terminated in January 2004. Record at 702. She testified that, in 2000, she fell in the lunchroom at work and injured her back; she testified that she filed a worker's compensation claim, which was rejected, but that she did not pursue a lawsuit. Record at 703-704. She testified that, since the fall, she has experienced chronic pain in her right shoulder, hip, pelvis and lower back, and that this pain prevents her from being able to work. Record at 705-706. She testified that, every day, her pain is an 8 on a scale of 1 to 10, with 10 being the most pain and zero being no pain at all. Record at 706. She testified that she also experiences pain in her right hand and

2

that it is difficult for her to hold things with that hand. Record at 707.

When asked whether she had any "mental concerns," Ms. Reed testified that she did not. Record at 709. She testified, however, that she takes Plaquenil, Celebrex and Tramadol, and that her medication impairs her memory and "a lot of times" makes her nauseous, dizzy and grumpy. Record at 711, 714. She testified that she has "a hard time paying attention" and that she has difficulty with her eyes; her vision is blurry and it is hard for her to focus – all of which she seems to attribute to the medication. Record at 714-715.

With regard to her daily activities, Ms. Reed testified that she typically gets up between 7:00 and 8:00 a.m. to make sure her son is up and ready for school; she testified that, after her children leave the house, she does her exercises, reads or watches television, and sometimes goes to the pool for water aerobics or to do her exercises. Record at 715-717. She testified that she also goes to physical therapy and medical appointments. Record at 717. She testified that she takes public transportation to these activities, usually the bus, but sometimes the El. Record at 717. She testified that her son and daughter do most of the chores around the house, that she is no longer able to cook and that she has difficulty getting in and out of the bath at home, so she generally showers at the pool.

Record at 718. She testified that she is usually able to get herself something to eat. Record at 721.

She testified that she belongs to a sorority group, but is not able to make the majority of the monthly meetings; she testified that she goes every three or four months. Record at 719. She testified that she gets together with friends "maybe twice a year" and gets together with her extended family once a year. Record at 719-720. She testified that she has a computer at home and uses it to play games and to send and receive email. Record at 720-721.

After Ms. Reed, the ALJ heard from Dr. William Newman, a Medical Expert, who testified that Ms. Reed suffered from several medically determinable impairments – namely, obesity, degenerative problems in her lower back and left knee (she has protrusions at L4 and L5 and chondromalacia with severe arthritis); she also has a partial tear in her right supraspinatus tendon. Record at 723-726. The ME testified that these impairments would not meet or equal a listed impairment, but that they would, nonetheless, affect Ms. Reed's ability to work. Record at 726. In particular, the ME testified that the impairments would limit Ms. Reed to sedentary employment. Record at 726. The ME also testified that her shoulder impairment would prevent her from doing any kind of "sustained overhead work with that right arm." Record at 728.

4

Finally, the ALJ heard from Glee Ann Kehr, a Vocational Expert, who testified that Ms. Reed's past work would be classified as light and unskilled, performed at the medium exertional level (the mail sorter job), and as light, low and semiskilled, with no transferable skills (the address clerk job). Record at 729. The ALJ then asked the VE whether a hypothetical person with Ms. Reed's age, education and work history, who could lift or carry 10 pounds occasionally and 5 pounds frequently, could occasionally bend, stoop, crouch, balance and climb stairs, who was restricted from overhead lifting, from working with her right upper extremity and from climbing ropes, ladders or scaffolds, and who was able to maintain concentration, persistence and pace with a 10 percent deficit, could perform Ms. Reed's past work. Record at 731. The VE testified that she could not. *Id.* She did testify, however, that this hypothetical person would be able to perform other work that exists in the national economy – notably, the work of an unskilled address clerk, account clerk, or telephone clerk, which the VE testified were "all sedentary, unskilled, S.P. 2 positions." Record at 731-732.

The ALJ then asked about a second hypothetical person who was identical in all respects to the first person, except that she was "so impacted by pain considerations that [her] concentration, persistence and pace is reduced to 75 percent of

the workday." Record at 732. The VE testified that there would be no jobs available for such a person. *Id.*

Finally, the ALJ asked about a third hypothetical person who was identical to the first hypothetical person, except that she could stand and walk for just two hours in an 8-hour workday and sit for a maximum of just 4 hours in an 8-hour workday; the VE testified that such a person would be unemployable. Record at 732. The VE testified that the same would be true for a person who missed three days of work per month. Record at 732-733.

   2.   Medical Records Before the ALJ

In addition to the testimony of Ms. Reed, the ME and the VE, the ALJ considered Ms. Reed's medical records, which show, initially, that, on March 20, 2000, Dr. Michael Haak with the Northwestern Medical Faculty Foundation diagnosed Ms. Reed with "a lumbar herniated disc." Record at 323. Dr. Haak prescribed physical therapy and anti-inflammatory medications and noted that he anticipated she would be able to return to full duty in six months. Record at 323.

There appears to be very little in the way of medical records dating from the time period in which Ms. Reed alleges that she became disabled. However, on October 11, 2004, Ms. Reed visited Dr. Matthew Hepler at Northwestern, complaining of back and leg pain, which she reported to have begun in 2000. Record at 327. Dr. Hepler noted that Ms. Reed had been diagnosed with

degenerative discs at L4-5 and L5-S1, with some degree of
radiculopathy, and that she had been "treated with a course of
injections, antiinflammatories, and therapy with some relief to
the pain." Record at 327. She reported that she had been doing
"fairly well" until earlier in 2004, when she was involved in a
car accident, which aggravated her pain. *Id.* She reported pain
at 8/10 on average and 10/10 at its worst; she also reported that
the pain was "aggravated by bending, lifting or twisting and
walking" and that it was "better when she is resting with the
knees and legs elevated." Record at 327. She reported that she
was not taking anything but ibuprofen, which was not particularly
helpful, and she reported that she had an injection in April,
which afforded about 50% improvement. *Id.* Dr. Hepler diagnosed
Ms. Reed with degenerative disc disease and mild lumbar
radiculopathy, and recommended antiinflammatories, aerobic and
core strengthening exercises and water aerobics. Record at 328.
Dr. Hepler noted that, if Ms. Reed failed to improve, he would
order an MRI and consider further injections and possibly even
surgery. Record at 329.

Ms. Reed returned to Dr. Hepler for a follow-up on December
8, 2004. Record at 332. At that time, she reported that her
back pain had largely resolved, but that she continued to have
pain in her knees; she reported that her knees get swollen and
achy when she walks. *Id.* Dr. Hepler recommended some additional

exercises for her knees and he also recommended a consult for further knee evaluation. Record at 332.

On December 20, 2004, Ms. Reed saw Dr. Renee Yap, in the Department of Orthopedic Surgery at Northwestern, for her knee pain. Record at 343. Dr. Yapp noted that there was no fracture, that the "joint spaces of both knees are preserved" and the "soft tissues are unremarkable aside from a left knee joint effusion." Record at 343.

On December 26, 2004, Ms. Reed had an MRI of her lower extremities, which revealed "a moderate to large joint effusion"; "a moderate size Baker cyst"; and "chondromalacia patella and osteoarthritic changes in the left knee, most marked in the patellofemoral compartment." Record at 344-345. That same day she also had an MRI of her spine, which showed "multilevel degenerative disc disease with small posterior midline disc protrusion at L5-S1 and small right foraminal protrusion at L4-L5" and a "1 cm synovial cyst arising from the left facet of L4-L5 and projecting into the posterior paraspinal soft tissues." Record at 347.

Ms. Reed returned for a follow-up with Dr. Hepler on February 28, 2005. Record at 331. At that time, Dr. Hepler reported that she continued to have pain in her lower back and knees, and that her back pain was "worse with activity." *Id.* Dr. Hepler recommended continuing the aqua therapy and

strengthening exercises; he also recommended that she see another doctor, Dr. Rittenberg, for her knees. Record at 331.

Ms. Reed again saw Dr. Hepler on May 5, 2005 for a follow-up; at that time, she complained of persistent worsening pain in her left knee and shin. Record at 330. Dr. Hepler diagnosed left knee osteoarthritis and recommended that Ms. Reed continue with the therapy exercises and anti-inflammatories; he noted that "[i]t does not look like we need to consider further treatment options including injections for the back for the time being." Record at 330.

The record shows that Ms. Reed saw Dr. Joshua Rittenburg – the knee doctor recommended by Dr. Hepler – on June 15, 2005, complaining of "[c]hronic pain involving the back, shoulders and knees." Record at 317. According to the notes from that initial office visit, Ms. Reed reported that her pain stemmed from a fall she took at work in January 2000. *Id.* She also reported that she had had "extensive treatment and workup including multiple MRIs, the last in December of 2004 . . . . She has also had EMG nerve conduction study in 2000 [and] multiple x-rays. She has had physical therapy treatment in 2000, chiropractic treatment, and injections apparently without fluroscopy in 2000. She has not received much really from this. She does not take any medications regularly for the pain. She does take Aleve approximately twice per week." Record at 318. At this initial

visit, Dr. Rittenburg also noted that Ms. Reed was obese and that her affect was "a bit flat." *Id.* Dr. Rittenberg diagnosed Ms. Reed with "[m]ultiple chronic pain complaints since a work-related injury in 2000 without significant improvement despite multiple interventions"; "[chronic right shoulder pain without signs of impingement or rotator cuff involvement"; "[c]hronic bilateral knee pain, likely due to degenerative joint disease"; and "[c]hronic pain syndrome." He referred her to the Chronic Pain Care Center for a comprehensive rehabilitation treatment plan. Record at 319.

On September 1, 2005, Mr. Reed went for a physical; she weighed 212 pounds, and her blood pressure was 142/90. Record at 374. She returned for follow-up blood pressure checks on September 22, 2005; November 18, 2005; January 17, 2006; January 31, 2006; and February 8, 2006.

The record shows that Dr. Alicia Lee referred Ms. Reed to a rheumatologist for her joint pain; she saw Dr. Rhew on October 7, 2005. Record at 311. At that initial visit, Ms. Reed reported that she experienced joint pain after she slipped and fell in January 2000; she reported that she fell first on her right knee and then her left knee, sought medical treatment for lower back pain, right hip pain and knee pain. *Id.* According to the office notes, Ms. Reed reported that she had epidural injections in October 2000, which helped, and that she considered surgery, but

decided against it when she relocated to Texas.  *Id.*  She
reported that she moved back to Chicago in 2004 and started
seeing Dr. Hepler for persistent back pain.  *Id.*  Dr. Rhew
diagnosed Ms. Reed as having back pain and knee pain secondary to
degenerative joint disease, for which she recommended naproxen,
which Ms. Reed was already taking; and bilateral carpal tunnel
syndrome, for which she recommended the use of splints at night.
Record at 315.

Ms. Reed was referred by Dr. Lee for physical therapy at the
Rehabilitation Institute of Chicago; she was evaluated on
November 14, 2005 and began her sessions shortly thereafter.
According to the treatment notes, during her sessions in December
2005 and January 2006, Ms. Reed was "very compliant with her home
exercise program"; she reported that her pain was decreasing and
that she was able to be more active around the house.  Record at
367.

Notes from an office visit on November 30, 2005 show that
Ms. Reed was being treated for lower back pain; she had
"degenerative changes of the lumbar spine with some mild right
radicular leg pain.  Record at 309.  She reported that she 'still
gets some discomfort into the right foot and toes but this is not
as bad as her knee pain.  She is satisfied with her progress in
terms of her back and radicular symptoms."  Record at 309.
According to the notes, Ms. Reed's symptoms were "well managed

and she is going to continue with current nonoperative modalities." Record at 309.

The record shows that Ms. Reed saw Dr. Alicia Lee on January 17, 2006, complaining of right shoulder pain; Dr. Lee ordered an x-ray, which showed that she had no fracture or dislocation. Record at 338. Ms. Reed returned to Dr. Lee on January 24, 2006 for an MRI of the lumbo-sacral spine, which showed "stable multilevel lumbar degenerative changes." Record at 336. The MRI report notes that "[t]here is no significant interval change in the size or appearance of small posterior midline disc protrusion at L5-S1 and small right foraminal disc protrusion at L4-L5. There is stable mass effect in the proximal right S1 nerve root and moderate foraminal stenosis at L4-L5 and mild bilateral foraminal stenosis at L5-S1. There is also a small distal foraminal lateral disc protrusion at L5-S1, which approximates the exiting right L5 nerve root. Correlation for possible right L4, L5 and S1 radiculopathy symptoms is recommended." Record at 336. That same day, Ms. Reed also had an MRI of her upper extremities, which showed "moderate right supraspinatus tendinosis, superimposed lineal, partial thickness, intrasubstance and bursal surface tear of the mid and posterior fibers of the right supraspinatus"; "secondary mild right subacromial subdeltoid bursitis"; and "mild right infraspinatus and long head of biceps tendinosis, mild tenosynovitis of the

long head of the biceps." Record at 334.

On March 27, 2006, Ms. Reed was examined by Dr. Romi Sethi on behalf of the Bureau of Disability Determination Services. Record at 375. Dr. Sethi noted that Ms. Reed had four main problems, clinically: she had a herniated disc in her back; she had carpal tunnel syndrome; she had paraesthesias in her legs; and she smoked - though the latter was not a basis for her disability allegation. With regard to the herniated disc, Dr. Sethi determined that, neurologically, her exam was negative, her gait was unremarkable, and her range of motion was "fairly normal"; Dr. Sethi noted that Ms. Reed was getting physiotherapy to help with this problem. Record at 378. With respect to the carpal tunnel syndrome, Dr. Sethi noted that Ms. Reed's grip was normal and that the use of splints at night seemed to address the problem. *Id.* With respect to the issues with her legs, Dr. Sethi noted that the neurological examination of her lower extremities was unremarkable, that she did not require an assistive device and could walk two to three blocks slowly without pain, and had no trouble getting on or off the examination table. Record at 375, 377-378.

Dr. Hepler and Dr. Rittenberg referred Ms. Reed to the Chronic Pain Care Center at the Rehabilitation Institute of Chicago, and she was seen there initially on September 29, 2006. At that time, she measured 5' 2" and weighed 209 pounds and

complained of pain in her back, knees, shoulder, and hands; she reported that she stopped working because her "physician told her that she should stop working." Record at 477, 479. She also reported that she was prescribed splints for her carpal tunnel, but that she doesn't use them. *Id.* She reported that her pain is, at its worst, a 7/10 and is aggravated by stress, going up and down stairs and lifting and relieved by warm water soaking and some of her medications. Record at 478. Her provider assessed her as having degenerative disk disease lumbosacral spine L4-5, L5-S1; SI joint dysfunction; osteoarthritis of knees with valgus deformity and patellofemoral arthritis; bilateral carpal metacarpal joint arthritis of thumbs; and deconditioning with obesity. Record at 479. He recommended that she go through the half day interdisciplinary chronic pain program when an opening is available, that she re-initiate physical therapy and resume a home program with range of motion and core strengthening; he also recommended that she undergo nerve conduction testing on her lower extremities and that she follow-up regarding pain relieving antidepressants. Record at 480.

On that initial visit to the Chronic Pain Care Center, Ms. Reed also underwent a psychological evaluation with Dr. Patricia Cole; at that time, Ms. Reed described her pain as "an aching sensation that is usually moderate." Record at 482. According to the evaluation, Ms. Reed reported that a number of factors

influence her pain level; she reported that her pain increases with anger, stress, climbing stairs and sitting for long periods of time and that it decreases with rest, medication (including vicodin, ultram and motrin) and alcohol. Record at 482. Ms. Reed reported that her pain has had a negative impact on her lifestyle and level of functioning, and that she is no longer able to work. Record at 482. Dr. Cole noted that Ms. Reed "engaged in moderate pain behaviors during the hour-long interview, sitting and moving in a guarded fashion, exhibiting poor posture and rubbing her wrist. Record at 482. Dr. Cole also noted that Ms. Reed "appears to be somewhat motivated to learn chronic pain management techniques and to increase her level of functioning, although she is ambivalent about return to work, saying, 'When I was working I never saw my kids, now I do.'" Record at 482. Dr. Cole determined that Ms. Reed's pain condition "appears to be maintained, at least in part, by potential disincentives to return to full functioning, as well as the patient's desire to be with her children during the time that she would otherwise be working." Record at 484. She also noted that Ms. Reed had "the education and the vocational experience that would make return to work in some form realistic. However, the patient's beliefs about return to work are a potential barrier to successful vocational rehabilitation." Record at 484. In the end, Dr. Cole diagnosed Ms. Reed with pain disorder

associated with psychological factors and general medical condition (Axis I) and chronic pain syndrome (Axis III) and she assessed her social and occupational functioning at a 60, indicating moderate impairment. Record at 484. She recommended that Ms. Reed participate in a chronic pain management program emphasizing cognitive behavioral techniques for managing chronic pain, stress management, emotion regulation, biofeedback-assisted relation training, family education and counseling, and vocational counseling. Record at 485.

Ms. Reed returned to the Chronic Pain Care Center on November 13, 2006, complaining of pain in her hand, shoulders and left knee; she reported that her pain was "constant, sharp and aching," had not improved, was worse when she writes, holds things, or takes steps and was "better when I rest and use ice and do not use the hands or arms." Record at 475.

The record shows that Ms. Reed was discharged from the Modified Pain Program on January 23, 2007 and was then monitored through the Chronic Pain Care Center at the Rehabilitation Institute of Chicago; she was seen on March 15, 2007, and was deemed to be "very compliant" with her home exercise program. Record at 471. Ms. Reed reported that, through the exercise program, her core strength had improved, as had her sleep; but she reported that she continued to experience severe pain in her left knee. Record at 471. It was noted that she had "lumbar

16

degenerative disk disease, possible sacroiliac joint dysfunction, with lumbar stabilization program, chronic left knee osteoarthritis, chondromalacia patella and effusion," and recommended that she continue with her exercise program. Record at 471. It was also noted that Ms. Reed was "not interested in pursuing surgery at the present time." *Id.*

On May 3, 2007, Ms. Reed reported to the Chronic Pain Center complaining of constant pain;" she described the pain as "aching, burning, cramping" and non-radiating, and she reported that it was worse when going up and down stairs, prolonged sitting and writing, and improved with icing and elevation of her legs, soaking, breathing exercises and pain pills. Record at 537. At the close of the session, the doctor recommended that she continue to work on knee strengthening and that she continue to do aquatic exercises; he also recommended that she make an appointment for a knee steroid injection to see if it helps her pain. Record at 538.

Ms. Reed had the steroid injection on June 7, 2007 and then returned to physical therapy on June 14, 2007, where she reported that her pain was now intermittent (it "comes and goes"), which would seem to suggest that the injection helped somewhat. Her provider, Dr. Joseph, reported that Ms. Reed had "participated in prolonged therapies and treatments" with "only minimal benefit." Record at 540. He did not recommend further pain management

protocols, noting that Ms. Reed "has had rather extensive treatment and after completing 1 type of treatment she complains of other problems; this has been a pattern with her. The patient has received maximal benefit from multiple disciplinary treatment for her chronic pain, and she is released to self care." Record at 540.

Summary physical therapy records show that Ms. Reed participated in numerous rounds of physical therapy. She had an initial evaluation on 11/14/05, and then attended 9 visits from 11/18/05 thru 12/14/05, and another 3 visits from 12/19/05 to 1/18/06. Record at 611, 614. She had an initial evaluation on 3/3/06, and attended sessions from 3/3/06 thru 3/30/06, when she was discharged. Record at 573. She had an initial evaluation at the Rehabilitation Institute of Chicago on 4/3/06, and then had 5 sessions between 4/4/06 and 5/8/06. Record at 571-572. She attended therapy sessions on 4/11/07; 4/24/07; 5/2/07; 5/8/07; 6/12/07; 10/30/07; 11/28/07; 11/29/07; 12/5/07; 12/12/07; 12/16/06; and 12/17/07. Record at 541-570.

The record shows that, on July 9, 2007, Ms. Reed returned to Dr. Rhew, the rheumatologist, for her persistent joint pain. Record at 455. Treatment notes from that visit show that Ms. Reed reported sometimes excruciating right upper extremity pain since March of 2007. Record at 456. By August 29, 2007, Ms. Reed had been diagnosed by Dr. Rhew with "unspecified diffuse

connective tissue disease" and "inflammatory arthritis."

Ms. Reed underwent a course of physical therapy with NovaCare beginning September 13, 2007 to address her right shoulder pain and her bilateral knee pain; the record shows that Ms. Reed received skilled rehabilitation therapy, as well as a home exercise program. She was discharged from physical therapy on October 24, 2007. Notes from that date show that, at the time of discharge, Ms. Reed "exhibits a fair prognosis"; her PT noted that she continued to report "generalized joint pain" some days, but felt that her pain was less frequent since starting therapeutic activities. Record at 436.

### 3. The ALJ's Decision

The ALJ issued his decision on October 31, 2008, finding that Ms. Reed was not disabled within the meaning of the Social Security Act. The ALJ applied the five-step sequential analysis prescribed by the Act, and determined, at step one, that Ms. Reed had not engaged in substantial gainful activity since January 27, 2004 (the date of her application). Record at 23. At step two, the ALJ determined that Ms. Reed had a number of severe impairments – namely, carpal tunnel syndrome, arthritis of the left knee, obesity, disc degeneration, Baker's cyst (also called poplieal cyst) and a partial tear of the supraspinatus tendon of the right shoulder. Record at 23. He determined, however, that these impairments – alone or in combination – did not meet or

equal any of the impairments listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1; in particular, the ALJ noted that he had
specifically considered sections 1.02 (musculoskeletal - major
dysfunction of a joint), 1.04 (musculoskeletal - disorders of the
spine), and 14.09 (immune system – inflammatory arthritis).
Record at 24. He explained that he rejected section 1.02 because
the severity of her left knee arthritis and disc degeneration,
even when combined with her obesity, did "not approach listing
level severity, in that there is no evidence of any significant
limitation of joint motion, joint space narrowing, or
instability." Record at 24. Also significant to the ALJ was the
fact that Ms. Reed was "full weight-bearing" and that there was
"no objective evidence showing inability to ambulate
effectively." *Id.* The ALJ also considered and rejected section
1.04 because "the objective medical record fails to substantiate
the extensive allegations of pain and restriction," and because
"there is no objective evidence of any nerve root compression or
significant limitation of the spine with motor loss or muscle
weakness." Record at 24. Finally, the ALJ considered and
rejected section 14.09 because "there is no objective evidence
that reveals significant joint pain, swelling and tenderness
resulting in inefficient ambulation or inability to perform fine
and gross movements effectively." *Id.*

At step four, the ALJ determined that Ms. Reed had the

residual functional capacity to perform a range of sedentary work. *Id.* In so concluding, the ALJ determine that Ms. Reed could lift/carry 10 pounds occasionally and 5 pounds frequently; that she could stand/walk occasionally and sit frequently; that she could occasionally bend, stoop, crouch, and balance, but never crawl or kneel; that she could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; that she could never perform overhead work with her right arm; and that she could maintain concentration, persistence and pace 90% of the workday. Record at 24.

The ALJ also determined that Ms. Reed's complaints of pain – both with respect to the severity and the effects of her pain – were not credible. Specifically, he determined that her complaints "so far outstrip the objective medical evidence and the medical opinions of the reviewers of that evidence like Dr. Newman, that the claimant cannot be considered credible. For instance, there is no objective support to substantiate excruciating pain to the point at which the claimant cannot even perform daily hygiene or use the bathroom without experiencing significant discomfort." Record at 27. The ALJ also noted that her allegations of severe, excruciating pain were also undermined by the record evidence, which included reports from Ms. Reed stating that her pain "comes and goes" and that her pain was decreasing and she was able to be more active around the house.

Record at 28. The ALJ also found incredible Ms. Reed's representations that her pain would impair her concentration, persistence and pace to the point of unemployability and that her frequent doctor and therapy appointments would require her to miss more days of work per month than would be tolerated by an employer. Record 28.

With these findings in mind, the ALJ determined, at step four, that Ms. Reed was precluded from performing her past relevant work. He determined however, at step five, that she was capable of performing other jobs that existed in the national economy in significant numbers - for example, account clerk, telephone clerk and address clerk. Record at 29.

   4.   Post-Decision Procedural History

Ms. Reed appealed the ALJ's decision, and, on October 15, 2009, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Ms. Reed then filed this lawsuit, on January 1, 2010, seeking review of that decision. The parties consented to proceed before a United States Magistrate Judge, and the case was assigned to this Court on March 22, 2010. Thereafter, the parties filed cross motions for summary judgment. Ms. Reed seeks reversal or remand, arguing that the ALJ (1) failed to consider her pain disorder diagnosis when he concluded that she could maintain concentration, persistence and pace at 90%; (2) failed to consider her pain

disorder, her obesity and the side effects of her medication when he assessed her credibility; and (3) made an erroneous step five determination. The Commissioner disagrees on all fronts, and asks the Court to affirm the decision to deny benefits.

B.  Discussion

To be entitled to benefits under the Social Security Act, a claimant must be "disabled" within the meaning of the Act - a determination made using the SSA's five step inquiry.  20 C.F.R. § 404.1520.  At step one, the ALJ establishes whether the individual is employed; at step two, the ALJ determines whether the individual has a severe impairment; at step three, the ALJ decides whether the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; at step four, the ALJ ascertains the individual's "Residual Functional Capacity" and determines whether she can perform her past relevant work; and, finally, at step five, the ALJ determines whether the individual is capable of performing other work that exists in significant numbers in the national economy.

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)). Should conflicting evidence permit reasonable minds to differ, it is the responsibility of the ALJ – not the courts – to determine if the claimant is disabled. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990). While the ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002). Unless the ALJ fails to rationally articulate the grounds for his decision in a manner that permits meaningful review, the Court must affirm if there is substantial evidence supporting the ALJ's decision. *Id.*

Ms. Reed argues that the Commissioner's decision must be reversed or remanded because (1) the ALJ failed to consider her pain disorder when he concluded that she could be on task for 90%

of the workday; (2) the ALJ failed to consider all of her
impairments – including her pain disorder and her obesity – when
he considered her ability to maintain persistence and pace and
her representations concerning the issue; and (3) the ALJ erred
in finding, at step 5, that she could perform the jobs identified
by the VE.

    1.    The ALJ's Findings Concerning Concentration,
           Persistence and Pace and the Impact
           of Ms. Reed's Pain Disorder

The ALJ determined that Ms. Reed had no mental impairment
and that she had the ability to maintain concentration,
persistence and pace 90% of the work day. Ms. Reed argues that
the ALJ was wrong to so conclude. She argues that, in reaching
this conclusion, the ALJ "completely overlooked Dr. Petra
Joseph's comprehensive psychological evaluation in September
2006, which showed the following DSM-IV Diagnoses: Axis I
Clinical Disorders of pain disorder associated with psychological
factors (stress and operant factors), and Axis V Social and
Occupational Functioning Assessment Scale ("GAF") of 60, which is
a moderate impairment." Plaintiff's Memorandum in Support of
Motion for Summary Judgment or Remand, p. 11.

Initially, the Court notes that the psychological evaluation
was actually done by Dr. Patricia Cole, not by Dr. Joseph.
Record at 481. What's more, Dr. Cole's report actually supports
the ALJ's conclusion that Ms. Reed had no mental impairment. For

example, under the "cognitive status" section of her report, Dr. Cole noted that Ms. Reed was "alert and oriented to person, place and time" and that her "[a]ttention and concentration were within normal limits." Record at 482. She noted that there was "no evidence of unusual thought processes indicative of cognitive impairment or a thought disorder." *Id.* Additionally, although Dr. Cole did score Ms. Reed at a 60 on the GAF Scale, it is clear that she based that, in no small part, on what she recognized to be Ms. Reed's disincentives to return to full functioning. See Record at 482, 484. In particular, Dr. Cole noted that Ms. Reed seemed to be motivated by a desire to not return to work so that she could spend time with her children. Record at 482. Additionally, a score of 60 is not, in itself, inconsistent with the ALJ's findings; that score is at the top end of the range characterized by "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, unable to keep a job)." DSM-IV, p. 32. The score falls short of the "some mild symptoms" category by just one point, and, especially when Dr. Cole's assessment of Ms. Reed's motivations are factored in, does not suggest a significant impairment in her concentration, persistence and pace. In this regard, Dr. Cole's assessment is consistent with Dr. Sethi's assessment. Accordingly, the Court is not persuaded that the ALJ

ignored Dr. Cole's assessment or that he erred when he determined that Ms. Reed could maintain concentration, persistence and pace 90% of the work day. Nor does the Court find any error in the ALJ's determination that Ms. Reed does not suffer from a mental impairment; indeed, she herself has never claimed to suffer from a mental impairment.

### 2. The ALJ's Credibility Determinations

Ms. Reed next argues that the ALJ ignored the record evidence showing that her medications caused numerous side effects that would limit her ability to work. She also argues that the ALJ improperly discounted her credibility with regard to the limiting effects of her medication and focused exclusively on the objective medical evidence in doing so.

An ALJ's credibility assessment is "afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). An ALJ must weigh all credible evidence, but the law "does not compel an ALJ to accept wholly the claimant's perception of a disability." *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). The ALJ's determination will not be reversed "unless it is patently wrong." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The Court does not review the medical evidence *de novo*, and will only declare the ALJ's determination patently wrong if it "lacks any explanation or

support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).
Social Security Ruling 96-7p requires a credibility decision to
"contain specific reasons for the finding on credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and to any
subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight."
*Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (explaining
that "a single, conclusory statement that 'the individual's
allegations have been considered' or that 'the allegations are
(or are not) credible'" is insufficient).

The Seventh Circuit has recently reiterated that, in
assessing a claimant's credibility, an ALJ may not simply offer a
perfunctory opinion, but must "carefully evaluate all evidence
bearing on the severity of pain and give specific reasons for
discounting a claimant's testimony about it." *Martinez v.
Astrue,* 630 F.3d 693, 696-697 (7th Cir. 2011). Here, the ALJ
actually used the very language criticized in *Martinez*, stating
in his report that "while the claimant's medically determinable
impairments could reasonably be expected to produce the alleged
symptoms, the statements made concerning the intensity,
persistence and limiting effects of those symptoms are not
credible to the extent they are inconsistent with the residual
functional capacity assessment . . . . ." Record at 27. But, in

contrast to the ALJ in *Martinez*, the ALJ here actually gave specific reasons for discounting Ms. Reed's credibility, and he explained how the record evidence specifically undermined her allegations. The ALJ here explained in detail why he did not believe her testimony concerning the limiting effects of her pain; he explained how the objective medical evidence undermined her allegations and how the opinions of her treating doctors and therapists similarly undermined her allegations.

The ALJ here explained his reasons for discounting Ms. Reed's allegations concerning the extent of her pain and the debilitating effects thereon. And his assessment of her credibility is entirely consistent with the opinions espoused by her treating physicians and therapy providers. Indeed, although Ms. Reed focuses on the language in Dr. Cole's report diagnosing her with an Axis I pain disorder, she seems to disregard the language in that same report suggesting that Ms. Reed's condition was very much affected by her desire to not get better, to not return to full functioning. Even Dr. Joseph, her physical therapy provider, noted that Ms. Reed had "participated in prolonged therapies and treatments" with "only minimal benefit," and declined to recommend further pain management protocols because she perceived that Ms. Reed was creating a moving target of sorts (Ms. Reed "has had rather extensive treatment and after completing 1 type of treatment she complains of other problems;

this has been a pattern with her.). Record at 540.

The record shows, in several instances, that Ms. Reed's issues are at least, in part, the result of her desire to avoid a return to full functioning: Ms. Reed expressed a fondness for being off work; her psychological evaluation demonstrated that she had a number of disincentives to a return to normalcy; her physical therapy provider recognized that she was consistently moving the target and shifting her story, as one issue resolved, she raised a new issue; she admitted that she opted not to implement prescribed therapies such as the splints for her carpal tunnel syndrome. Additionally, the record includes numerous instances where Ms. Reed acknowledged to providers that her condition improved when she followed the recommended course of treatment. The MRIs and physical examinations did not reveal anything that would account for the level of pain she claimed. And her allegations are belied by her own testimony: on November 30, 2005, she told Dr. Hepler that she was "satisfied with her progress in terms of her back and radicular symptoms." Record at 309. Physical therapy notes consistently reflect that, when Ms. Reed followed her program, she improved. In short, the ALJ's findings concerning credibility were explained and supported by substantial evidence.

3.   The ALJ's Step Five Findings

Finally, Ms. Reed argues that the ALJ failed to accurately

describe her limitations in his hypothetical to the VE. Ms. Reed acknowledges that the ALJ posed hypotheticals to the VE involving both a 10% reduction in concentration, persistence and pace, and a 25% reduction in concentration persistence and pace, and argues that he was wrong to accept the VE's testimony concerning the former, while disregarding the VE's testimony concerning the latter.

As explained above, the VE testified, in response to a hypothetical from the ALJ, that, if Ms. Reed were off task 25% of the time, she would be unemployable. Record at 732. The VE also testified that, if Ms. Reed were off task 10% of the workday, she could be employable; the VE testified that, given her other limitations, she could not perform her past relevant work, but she could perform other jobs that existed in substantial numbers in the national economy. When posing a hypothetical to determine a claimant's RFC, an ALJ is required to "orient the VE to the totality of a claimant's limitations," including deficiencies of concentration, persistence and pace. *See, e.g., O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010((citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir. 2003); *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002)). The ALJ did that here: he included all of the limitations supported by the record, including the specific limitation of a deficit in concentration, persistence

and pace. Admittedly, the specific percentage of the deficit was somewhat arbitrary – there is no specific formula for translating the record evidence into a particular percentage deficit. But the 10% deficit is no more arbitrary than the 25% deficit. More importantly, it is supported in the record and explained in the ALJ's decision.

Relatedly, Ms. Reed argues that the jobs the ALJ determined Ms. Reed could do all require frequent reaching, which she plainly cannot do, as the ALJ acknowledged. But the argument appears to misrepresent the DOT citations; the jobs require frequent reaching, not frequent overhead reaching. This is significant because the latter is clearly precluded by Ms. Reed's RFC, while the former is not. There is nothing in the objective medical evidence, or in the record, to suggest that Ms. Reed had no use of her upper extremities; rather, consistent with the ALJ's findings, the evidence showed that Ms. Reed was limited in the use of her right shoulder and that she should not engage in any activity that required the performance of overhead work with that arm. The limitation – acknowledged by the ALJ and supported in the record – was for overhead reaching. And, although Ms. Reed cites to notes from her physical therapy sessions to demonstrate that she could not even style her own hair, let alone engage in frequent reaching, that argument fails to consider the fact that, in each case, Ms. Reed was discharged from physical

therapy because she had improved and met her goals.  The Court will not remand on this basis.

## C.  **CONCLUSION**

For the reasons set forth above, the Court denies Ms. Reed's Motion for Summary Judgment [#21] and grants the Commissioner's Motion for Summary Judgment [#32].  The decision of the Commissioner is affirmed.

Date: August 31, 2011

E N T E R E D:

Arlander Keys

ARLANDER KEYS
UNITED STATES MAGISTRATE JUDGE